UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X

Avi Halaf,

                                    08-CV-4958
                    Plaintiff,       (CPS)(RLM)

        - against -

                                    MEMORANDUM
                                    OPINION AND
Ayelet Bazon Halaf                  ORDER

                    Defendant.

-------------------------------------------X

SIFTON, Senior Judge.

        Petitioner Avi Halaf brings this petition against respondent
Ayelet Bazon Halaf pursuant to the Convention on the Civil
Aspects of International Child Abduction, done at The Hague on
October 25, 1980 (the "Hague Convention"), T.I.A.S. No. 11,670,
19 I.L.M. 1501; see also Declaration of Christopher R. Thomson
dated November 5, 2008 ("Thomson Decl."), Exhibit ("Ex.") 1 (copy
of applicable articles of Hague Convention), as implemented in
the United States by the International Child Abduction Remedies
Act ("ICARA"), 42 U.S.C. § 11601 et seq.; see also Thomson Decl.
Ex. 2 (copy of applicable sections of ICARA).  Presently before
this Court is petitioner's request for an order directing the
return of his son, Tohar Israel Halaf (the "Child") to Israel
pursuant to the Hague Convention.  Upon the findings of fact and
conclusions of law set forth below, the request is denied.

**BACKGROUND**

The following allegations of fact are derived from the parties' submissions in connection with the verified Petition for Return of Child to Petitioner, as well as from testimony at an evidentiary hearing held on January 21 and 27, 2008, at which both parties and several witnesses testified.

Petitioner is an Israeli citizen, fluent in Hebrew, but not in English. Affidavit of Avi Halaf dated November 3, 2008 ("Avi Aff.") ¶ 1. He resides in Israel at Moshav Azaria, house no. 95, 99792. *Id.* Respondent is an Israeli and American citizen, currently residing at 105-24 63rd Road, Forest Hills, New York 11375. Pet. ¶ 10; Affidavit of Ayelet Bazon dated January 7, 2009 ("Ayelet Aff.") ¶ 1. Respondent lived in the United States with her parents between the ages of one and 18, when her family moved to Israel. Ayelet Aff. ¶ 2.

Petitioner and respondent met in Israel approximately five years ago, and they were married in Israel on February 23, 2005. Avi Aff. ¶ 2; Ayelet Aff. ¶ 3. According to respondent, from the day petitioner and respondent met, petitioner showed great interest in respondent's American citizenship and told respondent it was "his dream to live in New York." Ayelet Aff. ¶ 5. While married, petitioner and respondent lived in a separate apartment in respondent's parents' home. Ayelet Aff. ¶ 4; Avi Aff. ¶ 3.

Sometime in February 2006, petitioner and respondent began discussing the idea of relocating to the state of New York, where respondent's extended family resides. Avi Aff. ¶ 7. In November 2006, while respondent was pregnant with the Child, petitioner and respondent traveled to New York. Ayelet Aff. ¶ 6. According to respondent, petitioner's enthusiasm for New York redoubled during this trip, and petitioner tried to convince respondent that the family should relocate to New York.[1] *Id.* Respondent, however, was concerned about the jobs and benefits petitioner and respondent would leave behind in Israel. *Id.* At that time, petitioner was employed by the municipality of Modin, Israel as a construction engineer and city building inspector. *Id.*, Avi Aff. ¶ 11; Hr'g Tr. at 6:19-23. Respondent was employed as an administrator at El Al, an Israeli airline, where she had been offered union membership and shares in the company. Avi Aff. ¶ 11; Ayelet Aff. ¶ 6.

The Child was born on May 1, 2007, in Be'er Ya'aqov, Israel, and is an Israeli citizen. Avi Aff. ¶ 3; Ayelet Aff. ¶ 7; *see also* Thomson Decl. Ex. 4 (copy of Child's birth certificate). Respondent states that she has always been the Child's primary caregiver. Ayelet Aff. ¶ 7. According to petitioner, however, he participated in the care of the Child on a daily basis in

---

[1] Petitioner denies that he expressed an overwhelming desire to move to New York during this trip. Letter Brief of Jermaine L. McPherson dated February 6, 2009 ("McPherson Ltr.") at 3; Hr'g Tr. at 11:1-5.

Israel, including changing the Child's diapers, feeding him, taking him to and from day care, and watching him in the evening, when respondent would help her brother after work. Hr'g Tr. at 9:20-10:3. Although respondent acknowledges that petitioner took the Child to day care in the morning because the day care facility was on the way to petitioner's workplace, respondent denies that respondent ever changed the Child's diapers, and states that the Child was left in the care of someone other than herself only "on very rare occasions." Hr'g Tr. at 85:15-86:17; Ayelet Aff. ¶ 7. The day care where the Child was cared for following respondent's maternity leave is operated by respondent's sister, Avi Aff. ¶ 4; Ayelet Aff. ¶ 7, and is now based in New York. Ayelet Aff. ¶ 7. I find that both parents participated in the care of the Child.

Following the Child's birth, according to respondent, petitioner made the decision that he, respondent and the Child would relocate to New York. *Id.* ¶ 8. Respondent agreed and the family began preparations to leave Israel. *Id.* Petitioner states that he and respondent agreed that if petitioner could not find work in New York, then respondent and the Child would not follow him to New York and petitioner would return to Israel. Avi Aff. ¶¶ 9-10.

As a result of petitioner and respondent's decision to move to the United States, respondent's family also decided to

relocate to New York. Ayelet Aff. ¶ 9; *see also* Hr'g Tr. at
143:13-24; 144:20-21 (respondent's mother's testimony that she
sold her house in Israel and moved to New York). Respondent's
family had previously lived in New York and still maintained
businesses in New York. Ayelet Aff. ¶ 9. Petitioner was aware
of respondent's family's businesses in New York, and in fact
began to learn the locksmith trade from respondent's brother's
locksmith business in Israel so that he could work in New York
upon arrival. *Id*. ¶ 10; *see also* Affidavit of Eitan Ben Aharon
dated January 13, 2009, ¶¶ 1, 4-5 (statement from petitioner's
teacher, employed by respondent's brother, confirming
petitioner's successful completion of locksmith trade course);
Hr'g Tr. at 159:15-24 (respondent's brother's testimony that he
taught petitioner the locksmith trade).

Beginning in August of 2007, petitioner and respondent sold
substantially all of their belongings in Israel, including
furniture, kitchen equipment, televisions, beds, two cars and the
Child's personal items.[2] Ayelet Aff. ¶ 11. Respondent has
submitted without objection by petitioner a number of affidavits
from members of petitioner's and respondent's family and
community in Israel who either reviewed or purchased the family's
belongings, or with whom petitioner spoke about the move to New

---

[2] Petitioner testified that he left a television and some electrical
appliances at his mother's house. Hr'g Tr. at 46:14-24.

York.  *See* Affidavit of Yehudit Flint, Affidavit of Yaakov Bason, Affidavit of Eitan Ben Aharon, Affidavit of Esther Suliman, Affidavit of Yafit Jeanette Katan, Affidavit of Liat Benita, and Affidavit of Avner Tzafani, all dated January 13, 2009.

In addition, petitioner and respondent each wrote letters of resignation to their respective employers declaring their intention to move to New York.  Ayelet Aff. ¶ 13; *see also id.* Ex. A (copy of letter dated December 23, 2007 from El Al Airlines to respondent confirming receipt of respondent's December 16, 2007 resignation letter).  According to a colleague, however, petitioner told him that if things did not go as planned in the United States, he would return to Israel with respondent and the Child.  *See* Affidavit of Yifat Blibaum-Emanuel dated January 25, 2009.  Petitioner's last day of work was either December 31, 2007, or January 1, 2008.  Ayelet Aff. ¶ 13; Avi Aff. ¶ 11.[3] Respondent's last day of work was January 15, 2008, as some of respondent's benefits were not available to her until that date. Ayelet Aff. ¶ 13.  Respondent's manager at El Al airlines recommended respondent for a job in El Al's New York offices. *See id.* Ex. B (email dated November 25, 2007 from Rachel Rimon to Liora Avrahami recommending respondent for job in New York).

---

[3] In his affidavit, petitioner states that he "left [his] job on December 31, 2006 so that [he] could pursue other job opportunities in New York."  Avi Aff. ¶ 11.  However, given the placement of this statement, notably following a discussion of events that occurred in December 2007, *see id.* ¶ 8, I conclude that the December 31, 2006 date was a typographical error and should have been December 31, 2007.

On November 22, 2007, respondent booked airplane tickets to New York for herself, petitioner, and the Child, with petitioner's departure date set for January 15, 2008, and respondent and the Child's departure date set for January 31, 2008. *Id.* ¶ 14; Avi Aff. ¶ 12.[4] According to petitioner, respondent booked his ticket to New York with an open return date. Avi Aff. ¶ 12.

Before their departure, petitioner and respondent were both given farewell parties. Ayelet Aff. ¶ 15. Petitioner was given a farewell party by his fellow workers and his family. *Id.*; Hr'g Tr. at 42:15-43:5. Respondent states that petitioner also declared to the Social Security office in Israel that he and respondent intended to leave Israel, but that petitioner and respondent were advised to continue paying for social security as their medical benefits are tied to the social security system. Ayelet Aff. ¶ 16. Accordingly, petitioner and respondent continued to pay for social security and medical insurance in Israel. *Id.*; Avi Aff. ¶ 11. Petitioner and respondent did not close their joint checking account in Israel, as they planned to use it to make social security payments and because they were expecting a monetary compensation award relating to an injury

---

[4] In his affidavit, petitioner states that "[o]n or about November 2008, [respondent] booked him a roundtrip airplane ticket to New York with an open return date." Avi Aff. ¶ 12. However, given the placement of this statement, notably immediately prior to petitioner's statement that he traveled to New York on January 14, 2008, *see id.* ¶ 13, I conclude that the November 2008 date was a typographical error and should have been November 2007.

sustained by petitioner.  Ayelet Aff. ¶ 17; Avi Aff. ¶ 11.
However, the couple emptied and closed their Israeli savings
account.  Hr'g Tr. at 72:21-73:9; 101:20-22.

On January 15, 2008,[5] petitioner traveled alone to New York
on a tourist visa.  Hr'g Tr. 18:1-13; 117:16-118:9.  During his
trip, petitioner stayed in an apartment in Queens, New York,
owned by respondent's family.  Avi Aff. ¶ 13.  Petitioner states
that he searched for a job in New York for approximately two
weeks, but ultimately became convinced that he would not be able
to find work in the United States because he does not speak
English.  *Id.*  Petitioner further states that his living
situation in New York was "hostile," and that he was not getting
along with respondent's family, especially respondent's brother.
Pet. ¶ 26.  Respondent states, however, that following
petitioner's arrival in New York, respondent only heard positive
reports from petitioner about his life in New York.  Ayelet Aff.
¶ 18.  According to respondent, petitioner wrote to friends and
family telling them "how well he was getting along, except for
the cold weather."  *Id.*  Respondent states that at no time did
petitioner give her any indication that he had changed his mind
about New York or that she was not to come to New York.  *Id.*
Respondent's brother also testified that he and petitioner spent

---

[5] Petitioner and respondent disagree on the exact date of petitioner's
departure, with petitioner claiming that he left for New York on January 14,
2008, Avi Aff. ¶ 13, and respondent claiming that petitioner's departure date
was January 15, 2008.  Ayelet Aff. ¶¶ 14, 18.  The dispute is immaterial.

a substantial amount of time preparing the apartment for petitioner's arrival in New York with the Child. Hr'g Tr. at 154:24-155:11.

According to petitioner, on the morning of January 29, 2008, petitioner told respondent that he could not find a job in the United States due to his difficulty with the English language, and that he planned to return to Israel "per [their] prior agreement." Avi Aff. ¶ 14. Petitioner allegedly asked respondent to change the return date of his ticket so that he could return to Israel immediately. *Id.*; Pet. ¶ 27. According to petitioner, respondent agreed to change the return date of petitioner's ticket, but did not do so. Avi Aff. ¶¶ 14-15; Pet. ¶ 27. Respondent states that petitioner never communicated to her that he had decided to return to Israel. Ayelet Aff. ¶ 21.

On January 29, 2008 or January 31, 2008,[6] purportedly without petitioner's knowledge or consent, respondent traveled from Israel to New York with the Child. Avi Aff. ¶ 17; Ayelet Aff. ¶ 20. Neither petitioner nor any of respondent's family met respondent and the Child at the airport; instead, respondent and the Child took a taxi to the apartment where petitioner was staying. Hr'g Tr. at 25:20-26:2. Petitioner allegedly expressed

---

[6] Petitioner and respondent again disagree on the exact date of respondent's arrival in the United States, with petitioner claiming that respondent arrived in New York on January 29, 2008, Avi Aff. ¶ 17, and respondent claiming that she arrived in New York on January 31, 2008. Ayelet Aff. ¶ 18. Again the dispute is immaterial.

surprise upon respondent's arrival with the Child, and according to petitioner, an argument ensued. *Id.* at 26:4-5; 23:18-27:18. Respondent denies that any argument took place following her arrival with the Child. *Id.* at 107:10-14.

Despite his claim to have informed respondent of his decision to return to Israel at the end of January, petitioner remained in the United States during February and March of 2008. The couple purchased a king-sized bed (with a fifteen-year warranty), a 37-inch television, a two-year cable television contract, two Verizon cell phones with two-year contracts, a two-year internet service contract, a one-year BJ's supermarket membership, and a Chrysler minivan. Ayelet Aff. ¶ 20; *see also* Resp't Hr'g Ex. A (copy of cable television contract purchased in March 2008 in respondent's name); Resp't Hr'g Ex. J (receipts for minivan purchase in respondent's name, television and mattress purchases in both parties' names, and DVD player and childcare-related purchases, all made in February or March 2008); Resp't Hr'g Ex. K (receipt for March 2008 purchase of two-year cellular phone contract in respondent's name). Respondent further states that petitioner did find work in New York. Ayelet Aff. ¶ 22. Petitioner worked with respondent's brother, at a local deli in Flushing, and was planning to start a taxi business with the minivan the couple bought. *Id.; see also* Hr'g Tr. at 157:5-15 (respondent's brother's testimony that petitioner found work in a

deli).  According to respondent, petitioner's fluency in Hebrew was useful within the community in which the couple lived. Ayelet Aff. ¶ 22.

The parties differ as to the events of April 2008 that culminated in petitioner's return to Israel.  According to petitioner, petitioner asked respondent to return to Israel with him for the Passover holidays, but respondent refused either to go herself or to permit petitioner to take the Child with him. Pet. ¶ 31.  Petitioner thereafter traveled alone to Israel for the Passover holidays, allegedly intending to return to the United States a short time later to be with respondent and the Child until the family returned to Israel.  *Id.*; Avi Aff. ¶ 19. However, petitioner states that on April 24, 2008, respondent informed petitioner that she had decided to remain in the United States permanently and that she no longer wished to be married to petitioner.  Avi Aff. ¶ 19.  She also told petitioner that if he did not give her a divorce or a religious "get,"[7] she would not allow him to see the Child or reclaim any his money in the United States.  Hr'g Tr. at 37:5-9; 124:16-21; Pet. Hr'g Ex. A.  As a result, petitioner did not return to the United States.  Avi Aff. ¶ 19.

---

[7] A "get" is a writ of divorce under Jewish law, which must be given to a wife by her husband before their divorce may be recognized.  *See* Rachel Sara Rosenthal, <u>Of Pearls and Fish: An Analysis of Jewish Legal Texts on Sexuality and Their Significance for Contemporary American Jewish Movements</u>, 15 Colum. J. Gender & L. 485, 486, 512-23 (2006).

According to respondent, in April 2008, after a series of panic attacks in the middle of the night, petitioner confessed to respondent that he had engaged in an extra-marital affair in Israel, that he thought he was in love with the woman, and that he could not stop thinking about her. Ayelet Aff. ¶ 25; *see also* Hr'g Tr. at 157:19-158:12 (respondent's brother's testimony that petitioner told him he had a girlfriend in Israel shortly before petitioner's return to Israel). Petitioner allegedly told respondent that he wanted to return to Israel to "clear his head" and decide what to do about his marriage to petitioner. Ayelet Aff. ¶ 25. Although respondent states that she was "shocked and devastated," respondent begged petitioner to stay in New York. *Id.* ¶ 26. According to respondent, petitioner left for Israel on April 13, 2008, refusing to stay in New York for the Child's first Passover celebration. *Id.* ¶ 27.

While petitioner was in Israel, respondent states that she called him constantly to find out what he had decided concerning their marriage. *Id.* Petitioner allegedly told respondent not to pressure him. *Id.* When respondent told petitioner she would not accept petitioner's living with two women, and that he had either to choose respondent and the Child or end his marriage to respondent, petitioner allegedly became enraged and told respondent she was his property, and that he would never give her a divorce or a religious "get." *Id.*

Petitioner states that respondent has demanded that petitioner remain in Israel and refrain from contacting her or the Child. Avi Aff. ¶ 20. Respondent continues to live with the child in the United States, and petitioner is convinced that respondent will not return the Child to petitioner. *Id.* ¶ 22. Since April 13, 2008, petitioner has not provided respondent with any financial assistance, nor has he made any attempt to reestablish their marriage. Ayelet Aff. ¶ 28. Further, without respondent's knowledge, petitioner has withdrawn money from the couple's joint bank account in Israel, leaving it with a negative balance of 16,000 shekels (approximately $4,000). *Id.; see also* Hr'g Tr. at 101:20-22; 103:4-6; Resp't Hr'g Ex. I (bank statement showing negative balance).

On May 12, 2008, respondent hired an attorney to claim custody and child support for the Child. Ayelet Aff. ¶ 29.

On June 30, 2008, petitioner, through the Department of International Affairs Office of State Attorney on behalf of the Central Authority for the State of Israel, submitted his formal Request for the Return of the Child to the Central Authority of the United States in accordance with the Hague Convention. Pet. ¶ 35.

On October 12, 2008, petitioner called respondent and said that he was coming to New York to see the Child. Ayelet Aff. ¶ 31. Respondent then secured a temporary restraining order

against petitioner. *Id.* Subsequent to obtaining this order, respondent states that petitioner threatened her and the Child. *Id.* ¶ 32.

Respondent states that she and the Child are supported by her family and the community in New York. *Id.* ¶¶ 35, 37. Since April of 2008, respondent has had a steady job. *Id.* As it was in Israel, the Child is cared for in respondent's sister's day care facility, which is now based in New York, and the Child has the same teacher he had in Israel. *Id.* Respondent further states that she and the Child have no money, home, or belongings left in Israel, and that unlike her family in New York, petitioner's parents in Israel have little income and are not in a position to assist the Child. *Id.* ¶¶ 36-37.

## DISCUSSION

The Hague Convention entered into force in the United States on July 1, 1988, for the purpose of "protect[ing] children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, Preamble; 53 Fed. Reg. 23843. On the date that Congress adopted the Convention, it also passed ICARA to implement the multilateral treaty. 42 U.S.C. § 11601 *et seq.*; 53 Fed. Reg. 23843. The Hague Convention is specifically designed to prevent

the removal or retention of children by close family members.
"To deter family members from removing children to jurisdictions
more favorable to their custody claims in order to obtain a right
of custody from the authorities of the country to which the child
has been taken, the Hague Convention attempts to deprive [their]
actions of any practical or juridical consequences." *Gitter v.
Gitter*, 396 F.3d 124, 129-30 (2d Cir. 2005) (internal quotations
omitted).  The Hague Convention adopts the principle that the
child's country of "habitual residence" is "best placed to decide
upon questions of custody and access." *Croll v. Croll*, 229 F.3d
133, 137 (2d Cir. 2000) (internal quotations omitted).  Both the
United States and the United Kingdom are signatories to the Hague
Convention.  53 Fed. Reg. 23843.

The scope of a court's inquiry under the Hague Convention is
limited to the merits of the abduction claim.  ICARA specifically
provides that the Convention and its implementation "empower
courts in the United States to determine only rights under the
Convention and not the merits of any underlying child custody
claims."  42 U.S.C. § 11601(b)(4).  These principles of the
Convention have long been "embraced by unanimous federal
authority." *Friedrich v. Friedrich*, 78 F.3d 1060, 1063-64 (6th
Cir. 1996) (citing *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir.
1995); *Feder v. Evans-Feder*, 63 F.3d 217, 221 (3d Cir. 1995);
*Journe v. Journe*, 911 F. Supp. 43 (D.P.R. 1995)); *see also*

*Giampaolo v. Erneta*, 390 F. Supp. 2d 1269, 1275-76 (N.D. Ga. 2004); *Morris v. Morris*, 55 F. Supp. 2d 1156, 1160 (D. Colo. 1999) (recognizing that "[p]ursuant to Article 19 of the Convention, [this Court has] no power to pass on the merits of custody"); *Currier v. Currier*, 845 F. Supp. 916 (D.N.H. 1994); *Friedrich v. Friedrich*, 983 F.2d 1396, 1399 (6th Cir. 1993); *Meredith v. Meredith*, 759 F. Supp. 1432, 1434 (D. Ariz. 1991).

In order to prevail on a claim under the Hague Convention for the return of a child, a petitioner must establish by a preponderance of the evidence that the child was wrongfully removed or retained within the meaning of the Convention.  42 U.S.C. § 11603(e)(1)(A).  To establish wrongful removal or retention of a child, petitioner must show:  "that (1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Gitter*, 396 F.3d at 131; *see also* 42 U.S.C. § 11603(e)(1)(A).  If petitioner is successful in establishing each of these elements by a preponderance of the evidence, the burden then shifts to respondent to establish that one of the exceptions set forth in the Convention applies.  42 U.S.C. § 11603(e)(2).

1.  *Removal from Habitual Residence*

First, petitioner must show that respondent's removal of the Child from Israel to or retention in the United States constituted removal from or retention of the Child outside the State in which he was "habitually resident." The Hague Convention does not itself provide any definition of "habitually resident." However, the Second Circuit has held that analysis of a child's habitual residence begins with consideration of the relevant intentions, normally "the intent of the child's parents or others who may fix the child's residence." *Gitter v. Gitter*, 396 F.3d 124, 131-32 (2d Cir. 2005). Where the parents disagree as to the place they intended to be the child's habitual residence, it is the court's task to determine the intentions of the parents as of the last time that their intentions were shared. *Id.* at 133. "In making this determination the court should look, as always in determining intent, at actions as well as declarations." *Id.* at 134.

While the shared intent of the parents normally controls the habitual residence of the child, courts must also inquire whether the available evidence "unequivocally points to the conclusion that the child has acclimatized to [a] new location and thus has acquired a new habitual residence" notwithstanding the parents' intentions. *Id.* To determine if a child has acclimatized to her new location, courts "must consider if requiring return to the

original forum would now be tantamount to taking the child out of the family and social environment in which its life has developed.  Only in relatively rare circumstances will the child's acclimatization to a new location be so complete that serious harm to the child can be expected to result from compelling [her] return to the family's intended residence." *Daunis v. Daunis*, 222 Fed. Appx. 32, 34 (2d Cir. 2007) (internal citations and quotation marks omitted).  Therefore, "courts should be 'slow to infer' that the child's acclimatization trumps the parents' shared intent." *Gitter*, 396 F.3d at 134 (citing *Mozes v. Mozes*, 239 F.3d 1067, 1079 (9th Cir. 2001)).

Petitioner and respondent dispute whether they mutually intended the child to live in Israel or the United States at the time respondent removed the Child to the United States. According to petitioner, his trip to New York in advance of petitioner and the Child was merely a "trial period," and he never intended his family to resettle in the United States unless and until he found suitable employment in New York.  Once he allegedly failed to secure employment, petitioner states that he told respondent he did not wish the family to move to New York. Respondent, by contrast, states that petitioner decided to relocate the family to New York following the Child's birth because he thought the Child would be better raised and educated in the United States.  In support of this allegation, respondent

further alleges, and petitioner does not contest, that the couple resigned from their jobs, sold all their belongings, closed their savings account, and were given farewell parties before leaving Israel.  Once both petitioner and respondent were in New York, the couple made multiple purchases and long-term investments, which respondent alleges were secured in preparation for their new life in New York.  Respondent further states that petitioner did in fact find work in New York both with respondent's brother and in a deli, and that petitioner's reason for returning to Israel in April of 2008 was not because he could not find work or because he wished to spend the Passover holiday in Israel, but because he wished to pursue an extramarital affair with a woman in Israel.

According to respondent, both petitioner and respondent intended the Child to relocate permanently with them to New York until April of 2008, when petitioner decided to travel to Israel. At this time, when the relationship between petitioner and respondent deteriorated, the parties' intents diverged.  In light of respondent's detailed allegations, many of which petitioner does not contest and which support finding that the parties mutually decided to relocate to New York, and having considered testimony from both parties and witnesses at the evidentiary hearing, I find respondent's version of the facts to be considerably more credible than petitioner's account.

Accordingly, because I find that when petitioner and respondent's intents last converged, the parties intended for the Child to reside in the United States, I conclude that the Child's habitual residence is the United States. In light of this conclusion, I need not consider whether, notwithstanding his parents' intentions, there is evidence "unequivocally point[ing] to the conclusion" that the Child has acclimatized to his new location in the United States.

Having determined that the Child's habitual residence is the United States, I need not consider whether the Child was removed or retained in breach of petitioner's custody rights, whether petitioner was actually exercising his custody rights, or whether the "grave risk" defense raised by respondent applies. Because petitioner has failed to establish that the Child was removed from his habitual residence or retained in another state, petitioner has likewise failed to establish wrongful removal or retention of the Child within the meaning of the Hague Convention.

**CONCLUSION**

For the reasons set forth above, petitioner's request is denied and the petition is dismissed. The clerk is directed to transmit a filed copy of the within to all parties and the magistrate judge.

SO ORDERED.

Dated :   Brooklyn, New York
          February 24, 2009

                    By: <u>/s/ Charles P. Sifton (electronically signed)</u>
                        United States District Judge